LabCorp v. Ravgen, 2023-15-17. If you're ready, good morning again, your honors, and may it please the court. In this case, too, the board's errors are grounded in basic misapplications of obvious mislawed amendment to the board, again, upholding these exceptionally broad claims. Let me make the following basic points. First, with regard to the term, agent that impedes cell license. Here, the board erred by demanding far more out of this term than the claims demand. It is undisputed that Lee discloses the use of dextrose, which the 720 patent says is an agent that impedes cell license. But the board found it didn't disclose that it impeded cell license. The board found that it did, based on its evaluation of figure four, it said that in figure four of Lee, which shows the graph, that in three samples treated with ACD, two of them showed no meaningful leakage. Or in a third had some, after two days, showed no meaningful leakage, but then on a third day showed an upward slope on the graph. You're arguing facts. I'm sorry? You're arguing facts. Well, I'm not arguing facts here. Because what the board did here was infected by its demand that LabCorp not just show that there was a presence of a known agent, dextrose, and, by the way, there was plenty of substantial evidence to show that dextrose, when present, did in fact impede cell license because figure four showed an impedance. In the same way, by the way, that table, example four, rather, at page A142 of the 720 patent was the patentee's own proof, as it were, that there was cell license actually occurring. What the board required was that LabCorp actually show the mechanism of action. In fact, if you look at the board's language here, I believe it's A39, the board said that it demanded, quote, persuasive testimony, parsing out relative contributions of dextrose in prior coagulation. It didn't just look at the teachings on the face of the reference. It demanded that LabCorp actually dig down deep into, beyond the teachings of the prior reference. But isn't that a legitimate concern, since the board was saying, as I understood it, that coagulation was a possible explanation for what we're seeing in terms of the cell licensing, and we have to segregate the extent to which coagulation and other factors may have been inoperative and may have been operative here? Isn't that exactly what you would have expected the board to do in assessing this scientific evidence? Absolutely not, Your Honor. I would have expected the board to look to what the teaching actually teaches to a person of ordinary skill in the art. And look at what the board said about this figure four and about what the actual prior art reference said. It said- I'm not sure I understand the difference between what I said and saying that a person of ordinary skill would have concluded. The board was looking at this through the eyes of a person of ordinary skill and saying, coagulation is a concern here. Let's see if we can segregate out coagulation and other factors. What the board said was pure conjecture. In fact, if you look at the language of the board's opinion, it uses the terms could be and may be. That's not substantial evidence. What the evidence here showed, if this was even required as a matter of the claims, which is of course our top line position, is that an agent that impedes cell lysis is simply one of those enumerated agents from the patent. Dextrose is that. That should be the end of the inquiry. That's it. That's what an agent is. You don't have to actually show the mechanism of action. In fact, that's confirmed by the fact, if you look at the language of the claims, that the agent is selected from a Marcouche group. You can't know when you're selecting those agents what its mechanism of action is, whether it's actually going to work or in what way that it's going to work. The selection takes place. That meets the claim. An agent that impedes cell lysis. It's defined by the claims. Again, Judge Lurie, harking back to the earlier argument, these are very unusual claims. They're extraordinarily broad. They chose their language. They chose to write them in such a broad fashion. But ultimately, these claims depend on an agent that inhibits cell lysis. That's what these cases are about. That's right. And we know from the face of the 70-year-old patent. Substantial evidence is a standard of review. Substantial evidence requires that the art be evaluated for everything that it teaches. This art showed that there was lysis inhibition after the introduction of ACD. The D is the dextrose. That was a cell lysis inhibitor. That was all that was necessary for them to get their patent. That's what they put into their example four. We shouldn't be put to a higher standard for reading the prior art. That's our point with regard to substantial evidence. But with regard to understanding the claims in the first instance, it's dextrose. Dextrose is defined by the patent as a cell lysis inhibitor. That should be the beginning, middle, and end of that inquiry. Well, let's talk about your claim construction. I need some help there. The claim term is an agent that impedes cell lysis if cells are present, correct? Correct. It seems to me that you want that to be read as an agent that is capable of impeding cell lysis. So A, is that what you're essentially asking that term to be construed as? And B, did you ever ask the board to do that? I don't think we specifically asked the board for that, and I don't think that we needed to because I think it's clear from the language of the claim and the language of the patent that if, and I wouldn't necessarily say that capability is necessary. What would you say? I would say that an agent that is known to impede cell lysis. And again, we don't really have to go very far for interpretation because they're listed right there. You think the proper construction does not require that the agent actually be impeding cell lysis even when cells are present? I'm not sure how you do that inquiry. It certainly was not required. My friends over here. I'm just asking what the scope of the claim is. I understand. My view is that on this record, the scope of the claim is if you have an agent that is known as a cell lysis inhibitor, and there's a long list of them in the patent, then that is an agent that impedes cell lysis. Because of course, this is a method for detecting. And then you add the things into the pot, into the tube, into the dish, whatever the ... If theoretically there were circumstances where a known cell lysis inhibitor was present and cells are present, but for some reason, if we could magically see what was going on, we would all agree that that known agent is not actually inhibiting, just hypothetically. You say that's within the scope of the claims. They say it's not, correct? I think that's correct. I think that's a correct statement of the differences between the two parties here. And you just think that's clear from the claim language? I think it's clear from the claim language and further confirmed by the specification. The specification does not accept for the example four, which is the proof of the utility of this so-called invention. And where did you let the board know that that's your understanding of the claims? Well, I don't know that we did that in so many words except to say that we used the plain and ordinary meaning of the term and then were surprised that we were actually being put to not only show that there was actual inhibition, but also we actually had to show the mechanism of action by the time the board's final written decision came out. So that's the concern that we have there. If I may just make the point that the language of this claim does not require that cells be prevented from lysing. If that had been what they wanted, they could have claimed that, but they didn't. It just requires that the agent be present. It's very hard to read these claims as requiring an actual prevention of cell lysis. Because again, it is indeed conditional. It's if cells are present and you might not even know if cells are present when you're introducing the agent. So I'm not sure how you have to make that determination in the first instance. Let me turn to the second point, which is a bit of an echo to the first case, which has to do with the board again demanding perfection from the combination of Sorensen and Rau. The board here again said that a person of ordinary skill would not combine Rau with Sorensen because of concerns again about the effect of formaldehyde on DNA. Here I want to point out that the board here said cell-free fetal DNA in particular at page 44 of the appendix. That was a curious addition because these claims don't have a thing to do with cell-free fetal DNA. But putting that aside, here again as in the 277 appeal, the references here show that the combination of Rau and Sorensen was at the very least suitable. Sorensen here identified the problem of DNA release from lysis of white blood cells. The board dismissed LabCorp showing that a person of ordinary skill would have known to adjust Sorensen's relatively long dialysis step. This again is an echo of what we were talking about with regard to the 277 argument. The board cherry-picked the evidence, selectively quoted Dr. Edwards, but didn't at all quote Dr. Edwards' testimony that he would have known how to adjust the conditions of dialysis to reduce the long dialysis step of 18 to 24 hours. That again of course is a straightforward violation of this court's recent decision in exonics and other decisions, which says don't look to the requirements of the prior art, look to the requirements of the claims in assessing obviousness. So these broad claims in the 720 Patent 2 are obvious as a matter of law under the correct legal standards. And unless the court has further questions, I'll return on rebuttal. We will save your time for you. Thank you. Mr. Matting. Thank you, Your Honor. May it please the court. In this case, Appellant again is trying to twist sound findings of the board to evade substantial evidence review. The board in this case took a careful approach and properly applied guidance from this court in reaching two important findings in its decisions. The first, the board properly interpreted the plain language of the claimed agent to require that it impede cell lysis, as the claim says, and properly found that LabCorp failed to show that the dextrose in the Lee reference meets that requirement. Second, the board properly examined whether the Ralph Rommel-DeHuy combination here was a suitable option, again, without requiring that that combination be perfect or the most desirable. So on the first finding, the board properly interpreted the claims and found as a factual matter that Lee does not disclose the claimed agent. The starting point for this was all LabCorp's theory that they put forward from the start in their petition that they were parsing this ACD in Lee and relying on its dextrose component. So this anticipation ground was focused on dextrose from the start. There's other things in ACD LabCorp made very clear from the start. We are saying it is dextrose that is the agent in the prior reference. You don't really quarrel with that, do you? The fact that they approached it that way. Dextrose is a form of glucose, therefore... Absolutely. I think it was the proper approach. And that's why the way that the board looked at it and focused on, okay, what is dextrose doing? What evidence is there of dextrose impedance? That LabCorp takes issue with how the board looked at that. It was the proper way to address the ground. And the starting point then, of course, was the claim language. And the board looked at the claim and properly determined that the plain language of claim law says it's an agent that impedes cell lysis. It's not an agent that is capable of impeding cell lysis. It doesn't say it's an agent that was known to impede cell lysis. It says it's an agent that impedes cell lysis. How about disclosed to impede cell lysis? It's not... That language is not in the claim, Your Honor. And I think that's similar to known to. It's not a question of whether the agent is known to or had been previously disclosed in any reference to impede cell lysis. It's a question of in, for infringement in the product you're pointing to, or for invalidity in the prior art that you're pointing to, is that agent impeding cell lysis? So the claim requires, and that's the key to the question here. And the board set it up at Appendix 24 the proper way, looking right at the language of the claims and saying the plain language of the claims requires that the claimed agent impedes cell lysis. And the board was very careful to stick to the language of the claims and not add extra limitations or extra things that LabCorp had to prove, and it made that very clear. At Appendix 38 to 39, the board said, this is their words, we are mindful that the challenge claims do not require any particular degree of cell lysis impedance. But they do implicitly require at least some non-zero amount of cell lysis. That's exactly right. And that's what they said. I think it was explicit. At Appendix 38, the board said Leeds Dextrose would be the claimed agent if it even minimally impeded cell lysis. That was what the board appreciated, and that was how they framed their analysis. The suggestion, as I understand it, from LabCorp is that this claim construction was not really known to them, that when they said plain and ordinary meaning to the board, they meant it was sort of this, you know, capability type language or disclosed as a lysis stabilizer. They didn't really know that you and the board meant that it had to be something more, that there had to be actual proof of cell lysis happening, or of stabilization, impedance, excuse me, of cell lysis. Where could we see that it's clear that the board understood it had a claim construction dispute in front of it, and both sides had a fair opportunity to be heard on it, and it was resolved appropriately?  It was raised below. It was addressed below. The board was aware of it. And the board even asked LabCorp's counsel in the transcript of the oral hearing, it made clear that what their position was, was that they were just arguing that the agent had to be capable of impeding cell lysis. They were asked that by the board, and they confirmed, yes, that was their position. That's the page in the transcript we have in the appendix? Yes, absolutely, your honor. That appendix, that transcript, is that appendix 1370? Thank you. And the specific page cited in the briefing is the questioning where LabCorp's counsel was asked to clarify their position, and they clarified, yes, their position is that the agent just has to be capable. So it was squarely put to them, and they answered it then the same way that they are answering it today, which obviously we disagree with. So once the board determined the proper scope of the claim, the board went through and applied that scope to Lee and to LabCorp's evidence, including carefully addressing each of the three different theories that LabCorp put forward for how dextrose in Lee was impeding cell lysis. LabCorp implied that the board required them to show a specific mechanism. That's not what the board was doing in their analysis. The board was responding to LabCorp's argument that there were three mechanisms by which dextrose might be working, and that's how they framed the analysis. They didn't fault LabCorp for failing to prove a specific mechanism. They faulted LabCorp for failing to provide substantial evidence to support any one of their three offered mechanisms that came from them. The board started first with the Lee disclosure. It talked about what Lee itself actually discloses, read the reference, looked at what it said about dextrose, and the board found in Appendix 37 that Lee, in what it discloses itself, does not disclose dextrose's significance or attribute any difference in the observed differences in DNA levels to any specific cause beyond clotting. It decided that the explanation in Lee was that it was the process of clotting that was lysing white blood cells. The board didn't stop there. Of course, it took into account what a person of ordinary skill would appreciate reading Lee. LabCorp had put in evidence from their expert, again, regarding these three mechanisms of, even beyond the words of Lee, what a person of ordinary skill would have appreciated about what was going on with the dextrose in Lee, and the board addressed all of that. It stepped through each of the three mechanisms. On the first one, at Appendix 38, the board noted that the evidence was calling into question LabCorp's argument about dextrose interacting with membranes. That was their first mechanism that they offered. The board then addressed the second mechanism of action that LabCorp offered regarding isotonicity. At Appendix 27, the board addressed that one. It said that LabCorp had not shown that failure to maintain isotonicity would necessarily cause cell lysis. Then, for the third one, LabCorp had said glucose could also be a nutrient. The board addressed that one, too. At Appendix 27 to 28, the board found that the evidence does not persuasively support that dextrose serves as a nutrient to impede lysis in Lee. Through all of that, the board... That is because of the temperature factor? That's correct. They cited Lee's disclosure, specifically, that they stored cells at four degrees Celsius, and that that rendered the cells non-functional, as well as Dr. Edwards' admission that when you store cells at four degrees C, it decreases the metabolism of those cells. The board was supporting its finding about what is or is not going on with dextrose in Lee, not just with expert testimony, but with a full consideration of what Lee itself disclosed, and what this notion of what a person of ordinary skill in the art, reading Lee, would have appreciated. Taking all that evidence into account, the board found, as a factual matter, that Lee did not disclose the claimed agent. That question of what the prior art discloses and whether it beats the claims is a classic question of fact, and that is the question of fact that the board resolved with ample evidence to support its findings. Turning then to the second part of the board's findings, and again, this is a little bit of a repeat from the first decision, the board addressed the Rao combination, and again, assessed whether or not that combination would have been suitable. The board followed, in this case too, this court's guidance in cases like Arctic Cat, weighed the evidence both for and against motivation to combine, and ultimately found no motivation here. The board made that finding at Appendix 51, finding that a person of ordinary skill would have been dissuaded from using formaldehyde because of formaldehyde's potential detrimental effects on DNA. Similar to the other decisions, the board walked through some of the same evidence that I'm sure your honors are familiar with now regarding DNA's damage, so I won't recount all of that. Also here, the board specifically addressed Rao and its supposed teachings, and what it would or would not have told a person of ordinary skill regarding formaldehyde's use with cell free DNA. The board noted, again, at Appendix 48 to 49, that Rao discards the portion of the sample that might have contained any cell free DNA. It noted Dr. Van Ness had explained that same thing at Appendix 13, 515 to 16. Dr. Van Ness explained how the plasma was discarded in Rao and never studied and never used with formaldehyde. That was consistent with other approaches in the prior art, other knowledge of the person of ordinary skill, because as Dr. Van Ness explained and Dr. Lowe in his publication agreed, the plasma from samples had previously been discarded in these approaches that were using formaldehyde. Again, unable to overcome the substantial evidence that supports the board's findings here, LabCorp resorts to trying to create legal errors where there were none. Unless your honors have further questions, we'll ask that the board's decision here be affirmed. Thank you, counsel. No one ever loses points by not using up all of his time. Thank you. Mr. Castanius has a little time left. Thank you, your honor. I'll try to be brief anyway. First, Judge Stark's question about the fair opportunity. My friend pointed you to a question and answer with IPR counsel that occurred at the oral hearing in this case, asking what our position was. That can hardly be said to be fair opportunity or notice that we knew that there was a new claim construction or a new understanding of the claims. As I understand it, they made an express claim construction proposal, right? Their claim construction proposal had strictly to do with regard to an exclusion. You certainly had an opportunity to do the same. Why wasn't the burden on you to make clear what looks to me like your construction is slightly different than the plain language of the claims? That is, you want a capability language or a disclosed language or a known language? If you look at the page that my friend cited, which was the colloquy with LabCorp's counsel, that was our understanding that that was the plain language of the claims, particularly as informed by the specification where there was no requirement of performance or actual inhibition to be a cell lysis inhibitor. That wasn't noticed. It wasn't fair. We first found out that there was going to be a new understanding of the claims in the final written decision. Secondly, with regard to the combination, here, much like the first case, it's not just that the board demanded perfection. It's that the combination had to be suitable and that suitability requires actually analyzing both sides of the evidence. Here again, as in the 277 case, that just didn't happen. When the board's analysis doesn't consider all the evidence, this court can't be confident to know that the option is a suitable one. Finally, my friend mentions this court's decision in Arctic Cat, as he did in the earlier argument. This is a case that involves something that is a black box jury verdict from a district court. The court upholds a finding of non-obviousness on the ground that the jury in that case could have found teaching away on equivocal evidence. This, of course, is not the standard of review before the board, where the board is going to count evidence that both supports and detracts from the findings. This was a board that both in the 720 case and in the previous case cherry-picked the evidence that it decided that it wanted to rely on, ignored the evidence that it decided was not helpful to its case, and particularly in a situation where my friends on the other side agree the board did not make a teaching away finding. It is not fair to hold us to having failed to show obviousness here on a record where not all of our evidence was fairly considered. That's our submission on both cases. Unless the court has further questions for me, I thank the court for its indulgence. Thank you, Mr. Fustanius. The case is submitted.